**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHNNY BETTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 C 4095 |
| | ) | |
| CITY OF CHICAGO, ILLINOIS, and CHICAGO POLICE OFFICER L. PIERRI, Star No. 10956, and CHICAGO POLICE OFFICER V.R. STINAR, Star No. 4017, | ) | Honorable Joan B. Gottschall |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Johnny Betts brought this § 1983 false arrest suit against City of Chicago Police Officers Pierri and Stinar and the City of Chicago. Betts' complaint also includes claims for unlawful search, malicious prosecution, false imprisonment, intentional infliction of emotional distress, and indemnification. Before the court are the parties' motions *in limine*.

**LEGAL STANDARD**

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). The court has broad discretion to rule on evidentiary questions raised in motions *in limine*. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). Nevertheless, a court should grant a motion *in limine* excluding evidence only when the movant shows that the evidence "is inadmissible on all potential grounds." *CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs.*, 411 B.R. 591, 597 (N.D. Ill. 2009) (citing *Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003), and *Robenhorst v. Dematic Corp.*, No. 05 C 3192, 2008 WL

1821519, at *3 (N.D. Ill. Apr. 22, 2008)). "'[E]videntiary rulings should [ordinarily] be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.'" *Id.* (quoting *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)). Rulings on motions *in limine* are preliminary; "the district court may adjust a motion *in limine* during the course of a trial." *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006) (citing *Luce*, 469 U.S. at 41-42); *Luce*, 469 U.S. at 41-42 ("[A] ruling [*in limine*] is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.") Accordingly, the parties may renew their objections at trial as appropriate.

## ANALYSIS

### A. Plaintiff's Motion *In Limine* No. 1

For his first motion *in limine*, Betts argues that testimony that he was arrested in a "high narcotic area" should be excluded as irrelevant under Federal Rule of Evidence 401 or, in the alternative, because its probative value is outweighed by the risk of prejudice to Betts, such that it should be excluded under Federal Rule of Evidence 403. The defendants respond that this evidence is relevant and its probative value outweighs any risk of prejudice since, to determine whether the defendants had probable cause to arrest Betts, the jury must evaluate "the common-sense judgment of the officers based on a totality of the circumstances," including Betts' "presence in a high crime area." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999). This court agrees. Accordingly, Betts' first motion *in limine* is denied.

**B. Plaintiff's Motion *In Limine* No. 2**

For his second motion *in limine*, Betts argues that evidence regarding the following incidents in the criminal history of Betts and his witnesses should be excluded under Federal Rules of Evidence 402, 403, and 404: (a) arrests of Betts, Elizabeth Cameron, and Denise Thomas that did not lead to convictions, (b) Betts' Jan. 1988 felony conviction for theft, (c) Thomas' Nov. 2004 misdemeanor prostitution conviction, (d) Thomas' 1996 conviction for retail theft, and (e) Thomas' 1980 retail theft conviction. The defendants respond that they are not seeking to introduce the majority of the arrests and convictions of which Betts complains; rather, the defendants are seeking to introduce only Betts' arrest history (to rebut his emotional distress claim) and one of Thomas' convictions (for impeachment purposes).

*1. Betts' Arrest History*

The defendants argue that Betts' arrest history is relevant to his intentional infliction of emotional distress claim. In his deposition, Betts testified that he has been arrested multiple times within a few blocks of his house for drug possession. Betts believes that all of these arrests were improper. Prior arrests are usually inadmissible under Federal Rule of Evidence 403, which bars evidence when its probative value is outweighed by its risk of prejudice, and Federal Rule of Evidence 404(b), which provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but "may . . . be admissible for other purposes." Fed. R. Evid. 403 & 404(b); *see Cruz v. Safford*, 579 F.3d 840, 845 (7th Cir. 2009) (finding that the district court did not abuse its discretion by excluding evidence of seven prior arrests since the probative value of the prior arrests was outweighed by the risk of prejudice). A court deciding whether to admit Rule 404(b) evidence must consider whether:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*United States v. Connor*, 583 F.3d 1011, 1021 (7th Cir. 2010) (quoting *United States v. Diekhoff*, 535 F.3d 611, 617 (7th Cir. 2008)).

The defendants satisfy the first three prongs of this test since: (a) they are offering evidence of Betts' prior arrests to undermine his intentional infliction of emotional distress claim, not to show Betts' propensity to possess drugs, (b) the prior arrests are similar in that they were all for drug possession, occurred within a few blocks of Betts' home, and Betts himself contends that all of the arrests were wrongful, and (c) Betts' own testimony provides the jury with enough evidence to conclude that he was subjected to multiple prior arrests for drug possession near his home, all of which he contends were wrongful. However, the fourth prong of the test is not satisfied since, as explained below, it is far from clear that the evidence of Betts' prior arrests has enough probative value to his intentional infliction of emotional distress claim to outweigh the danger of unfair prejudice.

As the defendants point out, other courts have found prior arrests relevant to a jury's determination of how much, if any, emotional distress a plaintiff suffered from a later false arrest, reasoning that a person who has been arrested before would not be as traumatized as s/he claims to be since s/he has been through the arrest process before. *See, e.g., Gribben v. City of Summit*, No. 08 C 0123, 2010 WL 2928094, at *3 (N.D. Ill. Jul. 20, 2010) ("[I]f presented with evidence that Mr. Gribben had been arrested and incarcerated numerous times in the past, the jury could conclude that Mr. Gribben would not have been as emotionally traumatized by the arrest on January 6, 2007 as he claims to have been."); *Redmond v. City of Chi.*, No. 06 C 3611,

2008 WL 539164, at *2 (N.D. Ill. Feb. 26, 2008) ("Evidence concerning Redmond's prior arrests is relevant because if Redmond had been arrested on prior occasions the trier of fact could conclude from such evidence that Redmond would not have been as emotionally traumatized by the May 8, 2004, [sic] arrest as he claims since he had already experienced the arrest process on prior occasions."). However, in so reasoning, these courts did not point to any empirical evidence in support of their assumption that a false arrest plaintiff who had been arrested before would not be as traumatized as s/he claimed to be since s/he had been through the arrest process before. Indeed, this court is not aware of, and the defendants do not point to, any evidence that supports the proposition that a person who has been *wrongfully* arrested is less traumatized by the experience simply because s/he has been *lawfully* arrested before, let alone evidence that shows that a person is less traumatized by a wrongful arrest because s/he has been *wrongfully* arrested before (as Betts claims is the case here).

In fact, it is easy to see how the opposite conclusion could be true – that each false arrest was more demoralizing and distressing than the last. After all, if one false arrest is troubling, then a second may be doubly so. The plaintiff might have thought that the first false arrest was a fluke, the result of an officer or a few officers with poor judgment, perhaps nothing more; however, a second false arrest might lead the plaintiff to believe that something more insidious was going on – that s/he is a *de facto* second-class citizen, destined to endure routine indignities because society values him or her less than other people. Anecdoctal evidence of racial profiling suggests that this is indeed the case. *See*, *e.g*., Charu A. Chandrasekhar, *Flying While Brown: Federal Civil Rights Remedies to Post-9/11 Airline Racial Profiling of South Asians*, 10 ASIAN L. J. 215, 218 & n.13 (2003) (discussing a Canadian South Asian author who cut his U.S. book tour short "after being repeatedly subjected to intrusive airport searches." He complained that

"he was 'constantly made to feel like a second class citizen.'" "'[t]he first flight [my wife and I] took, we were greeted by a ticket agent who cheerfully told us that we had been selected randomly for a special security check . . . . Then it began to happen at every single stop, at every single airport. The random process took on a 100 [percent] certitude.'" (citation omitted)).[1]

---

[1] *See also Washington v. Lambert*, 98 F.3d 1181, 1187-88 (9th Cir. 1996) (discussing multiple cases of racial profiling including the case of Edward Lawson, "a law-abiding African-American man [who] was stopped or arrested *fifteen* times in primarily white neighborhoods in a 22-month period" and that of a well-known African-American prosecutor who was unlawfully "stopped by police five times a year" and explaining that repeated, unlawful stops by the police "are humiliating, damaging to the detainees' self-esteem, and reinforce the reality that racism and intolerance are for many African-Americans a regular part of their daily lives." (citing, *inter alia*, *Kolender v. Lawson*, 461 U.S. 352, 354, 103 S. Ct. 1855, 1856, 75 L. Ed. 2d 903 (1983))); *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 n.14, 1135 (9th Cir. 2000) (noting that many Mexican Americans also tire of repeated, unlawful stops in border areas and that "[s]tops based on race or ethnic appearance send the underlying message to all of our citizens that those who are not white are judged by the color of their skin alone. Such stops also send a clear message that those who are not white enjoy a lesser degree of constitutional protection – that they are in effect assumed to be potential criminals first and individuals second."); MICHELLE ALEXANDER, THE NEW JIM CROW 122 (2010) (noting that in certain areas, young black people are stopped and searched so frequently by the police that they "automatically 'assume the position[,' placing [their] hands up against the car and spreading [their] legs to be searched] when a patrol car pulls up, knowing full well that they will be detained and frisked no matter what"); Devon W. Carbado, *(E)racing the Fourth Amendment*, 100 MICH. L. REV. 946, 947-66 (2002) (discussing the burden of being repeatedly and unlawfully stopped by the police and noting that "the burden includes, but is not limited to, internalized racial obedience toward, and fear of, the police," and those who bear this burden take pains to appear non-threatening to police – attempting to "signal acquiescence and respectability" – lest the police harm them); David A. Harris, *The Stories, The Statistics, and the Law: Why "Driving While Black" Matters*, 84 MINN. L. REV. 265, 273-75, 288-89 (1999) ("To cope, African Americans often make adjustments in their daily activities. They avoid certain places where they think police will 'look' for blacks. Some drive bland cars . . . Some change the way they dress. Others who drive long distances even factor in extra time for the inevitable traffic stops they will face." However, most disconcerting is the manner in which black parents feel compelled to teach their children to behave during encounters with law enforcement: "Keep your hands on the steering wheel, let them do whatever they want to do. I know it's humiliating, but let them do whatever they want to do to make sure you get out of that situation alive. Deal with your emotions later. Your emotions are going to come second – or last." "These instructions will undoubtedly give black children a devastatingly poor impression of the police, but African-American parents say they have no choice. They know that traffic stops can lead to physical, even deadly, confrontations." Indeed, "[t]hese stops are not the minor inconveniences they might seem to those who are not subjected to them. Rather, they are experiences that can wound the soul and cause psychological scar tissue to form."); Anthony E. Mucchetti, *Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities*, 8 HARV. L. REV. 1, 17-18 (Spring 2005) ("Feelings of humiliation can compound as stops occur consistently over time. For instance, police pulled over one Iowa resident five times during the course of a summer as she made her way between home and school, although she was never issued a citation. Ninfa Ochoa-Krueger was stopped four times on a sixty-mile stretch of highway between McAllen and Brownsville, Texas, during a single trip. [T]hese incidents . . . exemplify how minorities can be made to feel like second-class citizens. As they stand by the side of the road while being peppered with questions from police and having their vehicles searched, Latinos may wonder if those passing by in cars are speculating as to whether the detainees 'had done something wrong, for why else would the police have them there?'" Also noting that Latinos sometimes change their daily routines to avoid unpleasant encounters with the police (e.g. taking a longer route to avoid all-white neighborhoods, purchasing plain-looking cars, and dressing so as not to attract attention). Further noting that, like African-Americans, Latinos take special care to instruct their children about how to behave if stopped by the police: "Sit up straight. If you slouch to the right or the left, the police are gonna think you're carrying a gun. Put both hands on the wheel so the police can see you don't have a weapon in your hands."); I. Bennett Capers, *Policing, Race, and Place*, 44 HARV.

Given the high risk of prejudice presented by evidence of Betts' prior arrests,[2] this court declines to admit this evidence without empirical evidence establishing that the probative value of this evidence outweighs the risk of prejudice. If the defendants would like to present an expert who can testify to the effect of prior arrests – whether wrongful or valid – on the trauma, if any, caused by a subsequent wrongful arrest, they may move for a hearing on the matter. If, indeed, this court ultimately finds this evidence admissible, and the defendants open the door by eliciting this evidence, the plaintiff may develop the record to substantiate his belief that each of these arrests were wrongful and increasingly distressing, if indeed that is the case.[3]

*2. Thomas' Conviction for Possession of Stolen or Fraudulently Obtained Checks*

In addition, the defendants argue that Thomas' 2006 conviction under 720 Ill. Comp. Stat. 5/17-1C(2) for possession of stolen or fraudulently obtained checks is admissible under Federal Rule of Evidence 609(a)(2), which allows a witness to be impeached by evidence that s/he was convicted of a crime "if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness."

---

C.R.-C.L. L. REV. 43, 68-69 (Winter 2009) ("Such stops, coming from the state, suggest a public discounting of worth, an asterisk on our protestations of equality, a caveat to our rhetoric about applying strict scrutiny to the state's use of racial distinctions. These stops are a dressing down, a public shaming, the very stigmatic harm that the Court has often, but not often enough, found troubling. They are something akin to the status punishment that the Court, in its better moments, has found unconstitutional . . . . In between these often officially invisible police-citizen encounters and stops, on the one hand, and the decision not to seek legal recourse, on the other hand, is often another decision that has consequences for race and space. That decision might be to think twice before visiting a friend or a colleague in a neighborhood that is comprised predominantly of another race, or to not risk being exposed to state violence, or to rule out moving to certain neighborhoods that lack an already existing minority (or non-minority) presence. That decision might be to play it safe by not crossing racialized borders and to not risk being deemed 'out of place.'")

[2] *See, e.g.*, *Barnd v. City of Tacoma*, 664 F.2d 1339, 1341 (9th Cir. 1982) (discussing whether the district court properly imposed sanctions after declaring a mistrial because defense counsel referred to the plaintiff's prior arrests in his opening statement).

[3] Furthermore, to guard against the risk of prejudice to Betts, the court will give a limiting instruction directing the jury that evidence of Betts' prior arrests may only be considered for the purposes of determining the amount of emotional distress, if any, Betts suffered after the arrest at issue here – the July 16, 2008 arrest.

Fed. R. Evid. 609(a)(2). Betts did not address this conviction in his motion *in limine* and did not submit a reply.

The Illinois law making "possession of stolen or fraudulently obtained checks" illegal provides that any person who (1) "possesses, with the intent to obtain access to funds of another person held in a real or fictitious deposit account at a financial institution," (2) "makes a false statement or a misrepresentation to the financial institution," *or* (3) "possesses, transfers, negotiates, or presents for payment a check, draft, or other item purported to direct the financial institution to withdraw or pay funds out of the account holder's deposit account with knowledge that such possession, transfer, negotiation, or presentment is not authorized by the account holder or the issuing financial institution is guilty of a Class A misdemeanor." 720 Ill. Comp. Stat. 5/17-1C(2). Making a false statement or a misrepresentation, or presenting a stolen check for payment clearly involves deceit, while merely possessing or transferring a stolen check does not. Thus, this crime is one "that may or may not involve deceit, depending on the circumstances." *Altobello v. Borden Confectionary Prods., Inc.*, 872 F.2d 215, 217 (7th Cir. 1989). Here, Betts submitted a criminal history report from the Chicago Police Department that reflects that in 2006, Thomas was arrested for "Fraud – Use Another'S [sic] Check." Thus, "the deceitful nature of the crime is . . . plain on the face of the indictment [or] other official record." *Id.* Given this, Thomas' 2006 conviction for possession of stolen or fraudulently obtained checks is admissible under Rule 609(a)(2).

Given the foregoing, Betts' second motion *in limine* is granted in part and denied in part. Evidence regarding (a) arrests of Cameron and Thomas that did not lead to convictions, (b) Betts' Jan. 1988 felony conviction for theft, (c) Thomas' Nov. 2004 misdemeanor prostitution conviction, (d) Thomas' 1996 conviction for retail theft, (e) Thomas' 1980 retail theft conviction

and (f) Betts' arrest history shall be excluded. Thomas' conviction for possession of stolen or fraudulently obtained checks may be used only for impeachment.

**C. Plaintiff's Motion *In Limine* No. 3**

For his third motion *in limine*, Betts seeks to bar the defendants from asserting that they are unable to pay punitive damages. Betts argues, "Since Defendant Officers have not produced income or asset information, they should be barred from now claiming an inability to pay as a defense to punitive damages pursuant to Federal Rule of Civil Procedure 26(c)(1)." (Betts' Mots. *In Limine* at 9.) However, Federal Rule of Civil Procedure 26(c)(1) relates to protective orders, and does not support Betts' argument. *See generally* Fed. R. Civ. P. 26(c)(1). For their part, the defendants argue that Betts has never requested any information about their finances. Furthermore, the defendants argue that Betts has failed to support his position with pertinent legal authority. Indeed, the Seventh Circuit has "repeatedly warned that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .'" *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). In any event, a defendant who "cannot pay a large award of punitive damages can point this out to the jury so that they will not waste their time and that of the bankruptcy courts by awarding an amount that exceeds his ability to pay." *Kemezy v. Peters*, 79 F.3d 33, 36 (7th Cir. 1996). Accordingly, Betts' third motion *in limine* is denied. However, to avoid any jury confusion, any evidence or argument by the defendants that they cannot afford to pay punitive damages will entitle Betts to a jury instruction that any compensatory damage award will be paid by the City of Chicago.

**D. Defendants' Motion *In Limine* No. 1**

For their first motion *in limine*, the defendants seek to bar evidence regarding a "code of silence," "blue wall," or any claim of a cover up. The defendants argue that such evidence is akin to prior bad acts evidence and would violate Federal Rules of Evidence 401, 402, and 403. However, "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984). Indeed, "A party's and a witness's common group membership is probative of bias . . . ." *Townsend v. Benya*, 287 F. Supp. 2d 868, 876 (N.D. Ill. 2003). However, the court agrees with the defendants that generalized allegations – separate and apart from what may be true of the officers named as defendants here – are not helpful and are akin to impermissible propensity evidence. *Maldonado v. Stinar*, No. 08 C 1954, 2010 WL 3075680, at *4 (Aug. 5, 2010) (allowing evidence of bias among the particular officers involved in the incident at issue there, while excluding generalized evidence of a "code of silence" or "blue wall" (citing *Christmas v. City of Chi.*, 691 F. Supp. 2d 811, 819 (N.D. Ill. 2010) (same), and *Moore v. City of Chi.*, No. 02 C 5130, 2008 WL 4549137, at *6 (Apr. 15, 2008) (same))). Thus, the defendants' first motion *in limine* is granted in part and denied in part as follows: (1) Betts may present evidence that Officers Stinar and Pierri are attempting to cover up the (allegedly) wrongful nature of Betts' July 16, 2008 arrest, (2) Betts may not use the term "code of silence" or "blue wall" as these terms are unduly prejudicial, (3) Betts may not introduce evidence that law enforcement officers typically adhere to a "code of silence" or "blue wall" or seek to cover up misconduct in order to protect fellow officers.

**E. Defendants' Motion *In Limine* No. 2**

For their second motion *in limine*, the defendants seek to bar any argument or testimony that Chicago Police Department personnel are paid by the City of Chicago to appear in court and testify. The defendants argue that such argument or testimony is barred by Federal Rules of Evidence 401 and 403 as irrelevant and more prejudicial than probative. The plaintiffs argue that this evidence is relevant to show bias on the part of the officers since "any employee would be reluctant to testify in a manner contrary to his employer's interest in a court of law." (Bett's Resp. at 3.) However, it will be apparent to the jury that Chicago Police Department personnel may be uncomfortable testifying in a manner that puts their employer in a bad light. The jury can take this into appropriate consideration without argument or testimony that these personnel are being paid their normal wage since they are on duty while testifying. Thus, the defendants' second motion *in limine* is granted in part and denied in part as follows: (1) Betts is barred from any argument or testimony that Chicago Police Department personnel are being paid any amount less than or equal to the wages they are normally paid to do their jobs as compensation for appearing in court and testifying, (2) Betts, however, may argue or elicit testimony to show that Chicago Police Department personnel are being paid *more* than their normal wage to appear in court or testify since such evidence would be probative of those employees' bias.

**F. Defendants' Motion *In Limine* No. 3**

For their third motion *in limine*, the defendants seek to bar any argument or testimony that the defendant officers or others conspired to cover up the wrongful nature of Betts' July 16, 2008 arrest. The defendants argue that this evidence should be excluded because Betts does not bring a conspiracy claim and such evidence is more prejudicial than probative such that it should

be excluded per Federal Rule of Evidence 403. Betts argues that the lack of a conspiracy claim should not prevent him from engaging in a proper bias cross-examination. This court agrees. The defendants complain that Betts would not have any good faith basis for asking the officers about any bias. Of course, as Betts' counsel must know, attorneys must have a good faith basis for posing questions. *See United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010) ("No attorney may ask a question if he doesn't have a good-faith basis to ask it; that is, attorneys cannot take a shot-in-the-dark approach to their questions.") (citing *United States v. Taylor*, 522 F.3d 731, 736 (7th Cir. 2008)). In any event, this court has already addressed this subject in its partial grant and partial denial of the defendants' first motion *in limine*. Thus, the defendants' third motion *in limine* is denied.

**G. Defendants' Motion *In Limine* No. 4**

For their fourth motion *in limine*, the defendants seek to bar: (1) the City of Chicago or Chicago Police Department from appearing on the caption, verdict form, and jury instructions, and (2) any evidence or testimony that the defendants may be indemnified by the City of Chicago for damages as irrelevant and highly prejudicial under Federal Rules of Evidence 403 and 411. *See* Fed. R. Evid. 411 (prohibiting, with certain exceptions, evidence that a person was or was not insured); *Walker v. Saenz*, No. 91 C 3669, 1992 WL 317188, at *3 (N.D. Ill. Oct. 27, 1992) ("Rule 411 does not protect defendants from the introduction of [evidence that the defendants will be indemnified by the City of Chicago]."). The defendants argue that this motion should be granted because Betts' *Monell* claims are not at issue in this trial, given the court's January 14, 2010 bifurcation order. Betts does not oppose this motion except insofar as Betts would like to proffer evidence and testimony regarding indemnification if the defendants

open the door to the same by suggesting that they will be personally responsible for paying a damages award.

Indeed, despite "the general rule that evidence of payments received from collateral sources is inadmissible," where a defendant testifies to his/her financial hardship, thereby leaving the jury with the impression that the defendant will be personally responsible for paying damages, when in reality the defendant will be indemnified, the defendant has opened the door to the plaintiff's presentation of evidence showing that the defendant will be indemnified. *Lawson v. Trowbridge*, 153 F.3d 368, 378-79 (7th Cir. 1998); *see Kemezy*, 79 F.3d at 37 ("The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab."). This analysis is complicated by the fact that the defendants here will not be indemnified for any punitive damages and, as a result, would like to introduce evidence of their financial condition without opening the door to the fact that the City of Chicago will indemnify them for compensatory damages. However, the defendants cannot have it both ways. They cannot plead poverty, thereby risking giving the impression that they will be responsible for paying any and all damages, without opening the door to Betts' presentation of evidence to the contrary.

In *Mohr v. Chicago School Reform Board of Trustees,* 155 F. Supp. 2d 923 (N.D. Ill. 2001), the court reasoned that it would make no sense to hold that defendants who are fully indemnified open the door by pleading poverty, while defendants who are partially indemnified do not. *Id.* at 929. Indeed, the rationale behind finding that such defendants have opened the door – guarding against the risk that jurors will be led to believe that the defendants will have to pay out of pocket for damages – applies to both. Furthermore, as the *Mohr* court concluded, "Because the jury was informed that under Illinois law, the individual defendants themselves

would bear the burden of any punitive damages award, there was no danger that this unindemnified award might be inflated" as a result of informing the jury of the fact of indemnification. *Id.* In addition, there is no danger that compensatory damages will be inflated because the jury knows the defendants will be indemnified, since compensatory damages will be limited to actual losses. *Id.*

Accordingly, the defendants' fourth motion *in limine* is granted. Thus, Betts is barred from: (1) including the City of Chicago or Chicago Police Department as a party in the caption, verdict form, or jury instructions, and (2) presenting any evidence or testimony that the defendants may be indemnified by the City of Chicago for damages. However, if the defendants plead poverty as to any damages, Betts may offer evidence of indemnification.

**H. Defendants' Motion *In Limine* No. 5**

For their fifth motion *in limine*, the defendants seek to bar reference to other lawsuits, incidents, and the defendants' disciplinary history. The defendants argue that such evidence should be excluded as irrelevant under Federal Rule of Evidence 401, given the bifurcation of the *Monell* claims, or as more prejudicial than probative under Federal Rule of Evidence 403. For his part, Betts states that he "does not intend on introducing evidence of complaint registers, Internal Affairs Investigations and/or IPRA[4] Investigations, or lawsuits of any Officers unless Defendants open the door to the introduction of such evidence by introducing testimony that, for example, the Defendant Officers are exemplary police officers . . . ." (Betts' Resp. at 5.) The defendants respond that they do not plan to introduce evidence that they are exemplary police officers. Accordingly, the defendants fifth motion *in limine* is granted insofar as reference to other lawsuits, incidents, and the defendants' disciplinary history is excluded unless the

[4] Betts does not define the term "IPRA."

defendants suggest that they are exemplary police officers, in which case the defendants will have opened the door to Betts' presentation of evidence to the contrary.

**I. Defendants' Motion *In Limine* No. 6**

For their sixth motion *in limine*, the defendants seek to bar lay opinions regarding physical or mental diagnosis or any mental injuries Betts suffered. The defendants explain that Betts alleges he suffered "severe emotional harm," and that they anticipate that Betts will call lay witnesses to testify to his injuries. (Defs.' Mot. *In Limine* No. 6 at 1.) The defendants argue that Betts and his witnesses do not have any specialized knowledge that would qualify them to opine on Betts' alleged mental injuries. For his part, Betts states that he and his witnesses "will not offer improper opinion testimony regarding his mental injuries," but will testify about the emotional harm he suffered. (Betts' Resp. at 6.) For their reply, the defendants change course, stating that they moved to bar only "improper opinion testimony."

While it is true that Federal Rule of Evidence 701 prohibits lay witnesses from testifying about matters which require specialized knowledge (but, by implication, allows lay witnesses to testify about matters that do not require expertise), the defendants do not point to any specific testimony that they seek to bar. Without specifics, the court cannot evaluate whether the testimony would violate Rule 701. Furthermore, the court will be better able to rule on the admissibility of testimony at trial, when the context of the testimony is clear. Accordingly, the defendants' sixth motion *in limine* is denied.

**J. Defendants' Motion *In Limine* No. 7**

For their seventh motion *in limine*, the defendants seek to bar reference to the preliminary hearing court's finding of "no probable cause." The defendants argue that this evidence is irrelevant under Federal Rule of Evidence 401 since probable cause at the time of the arrest is

determined using information known to the police officers at the time the arrest was made. *See Mucha v. Vill. of Oak Brook*, --- F.3d ----, No. 10-2000, 2011 WL 489617, at *3 (7th Cir. Feb. 14, 2011) ("In evaluating probable cause, we look only to the information known to the officer at the time of arrest . . . ."). In addition, the defendants argue that this evidence would be more prejudicial than probative and should be excluded per Federal Rule of Evidence 403, is inadmissible hearsay, and would necessitate a mini-trial (defendants would present evidence about why the preliminary hearing judge may have found "no probable cause"). For his part, Betts argues that he "never intended to use the criminal court finding to collaterally attack the [defendants'] argument that [they] had probable cause to arrest him;" rather, Betts contends that he "has consistently argued that [the defendants'] version of the events . . . is simply a lie." (Betts' Resp. at 7.) Betts appears to argue that the "no probable cause" finding is probative of whether or not the officers are lying.[5] In addition, Betts contends that the court can prevent any prejudicial effect by giving a limiting instruction.

*Hillard v. City of Chicago*, No. 09 C 2017, 2010 WL 1664941 (N.D. Ill. Apr. 23, 2010), is on point. As the court there explained:

> [T]he "no probable cause" finding is irrelevant to the determination whether [sic] defendants had probable cause to arrest Hillard. As defendants note, there is no feasible way to determine what factors, outside of those known to the officers at the time of arrest, contributed to the state court's probable cause determination. The preliminary hearing served to determine whether there was probable cause to believe Hillard committed the offense charged. The focus was on whether there was sufficient evidence to prosecute, not on whether the officers had probable cause to make an arrest in the first place. Hillard's false arrest claim, however, turns on whether, at the time of arrest, the facts and circumstances within the arresting officers' knowledge was sufficient to warrant a prudent police officer to believe that Hillard had committed or was committing an offense. Moreover, introduction of the "no probable cause" finding risks a substantial prejudicial effect, as the jury may equate the state court's finding with a determination as to the propriety of the defendant officers' actions. Hillard insists the court can

[5] The court does not understand this argument. However, since rulings *in limine* are preliminary, counsel may attempt to persuade the court again.

> address this concern with a limiting instruction. However, the tenuous relevance of this evidence does not outweigh the risk that it will confuse and mislead the jury.

*Id.* at *5 (internal citations omitted). This court agrees. Accordingly, the defendants' seventh motion *in limine* is granted.

**K. Defendants' Motion *In Limine* No. 8**

For their eighth motion *in limine*, the defendants seek to bar argument or innuendo that the defendants have multiple attorneys or references to the defendants' attorneys as "the City's lawyers" or "the City." Betts does not oppose this motion *in limine* as he does not intend to use such argument, innuendo, or references. Accordingly, the defendants' eighth motion *in limine* is granted.

**L. Defendant's Motion *In Limine* No. 9**

For their ninth motion *in limine*, the defendants seek to bar argument or innuendo that Betts intends to "send a message" to the City of Chicago or the Chicago Police Department. The defendants argue that this argument is one for punitive damages, which cannot be assessed against a municipality on § 1983 claims. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983.") While Betts agrees that arguing that he is attempting to "send a message" is an argument for punitive damages, he contends that such an argument is aimed at the defendants and other Chicago Police Officers, although it is proper to argue that he wants to send a message to the City of Chicago itself since it is those officers' employer. As Betts argues, "While punitive damages cannot be awarded against the City, there is no reason to prohibit Plaintiff's counsel from asking the jury to send a message to the City that falsely

arresting a citizen of Chicago, i.e. Plaintiff, is simply not acceptable in a civilized society." (Betts' Resp. at 10.)

"The standard judicial formulation of the purpose of punitive damages is that it is to punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct." *Kemezy*, 79 F.3d at 34. By arguing that he'd like to "send a message" to the defendants, other Chicago police officers, and the City of Chicago as their employer, Betts contends he is essentially saying that he'd like to deter them from future misconduct. *See Cooper v. Casey*, 97 F.3d 914, 920 (7th Cir. 1996) (noting that a small amount of punitive damages would have an inadequate "deterrent effect" and would not serve as a "signal" to the defendants that certain misconduct was unacceptable). Betts also points out that another district court in this circuit denied a similar motion *in limine* on grounds that the defendants "fail[ed] to show why a jury could not 'send a message' to the city by requiring it to pay actual damages." *Saunders v. City of Chi.*, 320 F. Supp. 2d 735, 738 (N.D. Ill. 2004). The defendants reply that allowing Betts "to argue that the jury should send a message to the City or Chicago Police Department would create an impermissible inference that the City's deep pockets are available to cover any award the jury may give." (Defs.' Reply in Supp. of their Mot. *In Limine* No. 9 at 2.)

Given that compensatory damages are limited to actual losses, this court agrees that Betts' argument that the jury should "send a message" is a punitive damages argument. Nevertheless, this court is not persuaded that Betts should not be able to argue that he is attempting to deter the defendant officers and other Chicago police officers from future misconduct. However, any argument that he would like to "send a message"

to the City implies that the city has a policy or practice of condoning such misconduct, which is precisely the question at issue in Betts' *Monell* claim that is not being addressed in this trial. Accordingly, the defendants' motion *in limine* is granted insofar as Betts is barred from any argument that the jury should "send a message" to the City of Chicago. However, the defendants' motion *in limine* is denied insofar as Betts will be permitted to argue that he is attempting to deter the defendant officers and other Chicago police officers from future misconduct.

## I. CONCLUSION

Given the foregoing, the following motions *in limine* are granted: the defendants' motions *in limine* Nos. 4 and 5 (although the defendant may open the door to the evidence at issue in these two motions *in limine*) and the defendants' motions *in limine* Nos. 7 and 8; the following motions *in limine* are granted in part and denied in part: Betts' motion *in limine* No. 2 and the defendants' motions *in limine* Nos. 1, 2, and 9; and the following motions *in limine* are denied: Betts' motions *in limine* Nos. 1 and 3 and the defendants' motions *in limine* Nos. 3 and 6.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: May 13, 2011